1
2
3
4
5
6
7
8
9

10              UNITED STATES DISTRICT COURT
11           SOUTHERN DISTRICT OF CALIFORNIA

12

13   TAMARA McANALLY,                     CASE NO. 11-CV-2741 W (KSC)

14                         Plaintiff,     ORDER DENYING
15                                        DEFENDANTS' MOTION TO
         v.                               DISMISS THE FAC [DOC. 25]
16
17   ERNEST L. MARUGG, et al.,

18                         Defendants.

19        Pending before the Court is a motion to dismiss the First Amended Complaint
20   ("FAC" [Doc. 21]) filed by Defendants County of San Diego, Dominic Dugo, Bonnie
21   Dumanis, and David Lattuca (the "Supervisor Defendants").   Plaintiff Tamara
22   McAnally opposes.

23        The Court decides the matter on the papers submitted and without oral
24   argument. See Civ. L. R. 7.1(d.1).  For the reasons discussed below, the Court DENIES
25   the motion [Doc. 25].
26   //
27   //
28

11cv2741w

1   **I.   B<small>ACKGROUND</small>**

2       The following facts are taken from the FAC.

3       In December 2002, Plaintiff Tamara McAnally and her husband, Jon McAnally,

4   formed a construction company, McAnally Inc., dba JDM Enterprises ("JDM"). (*FAC*,

5   ¶ 21.) JDM did general contracting work, and also acted as a subcontractor on jobs for

6   other general contractors. (*Id.*) Tamara was JDM's Secretary. (*Id.*)

7       In 2001, JDM worked as a framing subcontractor for Landco Construction Inc.

8   (*Id.*, ¶ 23.) Eventually, a dispute arose between JDM and Landco that resulted in

9   litigation. (*Id.*) Tamara contends that in retribution for the litigation, Landco filed a

10  complaint with the San Diego District Attorney's office alleging, among other things,

11  that JDM and its officers, including Tamara and Jon, were mischaracterizing their

12  employees' status in order to defraud their workers compensation insurance carrier, the

13  State Compensation Insurance Fund ("SCIF").[1] (*Id.*, ¶¶ 22, 24.) Tamara contends the

14  allegations were false. (*Id.*, ¶ 22.)

15      As a result of Landco's allegations, SCIF conducted an audit, in conjunction with

16  the D.A.'s Office. (*FAC*, ¶ 25.) Defendant Ernest L. Marugg was the Deputy D.A. in

17  charge of the matter, and Defendant Alexander Lutzi was the investigator working for

18  Marugg. (*Id.*) The audit was completed on March 6, 2003. (*Id.*, ¶ 25.) Despite the

19  lack of evidence of intentional wrongdoing, Tamara and Jon were indicted for insurance

20  and tax fraud. (*Id.*, ¶ 33.)

21      On April 19, 2004, Tamara and Jon pled guilty to conspiracy to commit

22  insurance fraud. (*FAC*, ¶¶ 43, 44.) Tamara contends the guilty pleas were entered in

23  response to the threat that they could go to prison if convicted, and because Marugg

24  represented that JDM and Jon would be allowed to retain their contractor license. (*Id.*,

25  ¶ 42.) Jon's plea agreement, therefore, provided:

26

27  ———————————

28      [1] Defendants SCIF and its employee, Defendant Kathey Bradley, were dismissed on
    March 13, 2013, pursuant to a joint motion. (*See Order* [doc. 38].)

#2.  I have not been induced to enter this plea by any promise or representation of any kind, EXCEPT: . . . . The District Attorney will cooperate with Contractors State License Board to allow Mr. McAnally to maintain his contractors license.

* * *

#16.  Could lose Contractors License ONLY if prison sentence.

(*Id.*, ¶ 49.)  The plea agreement also required Tamara and Jon to pay $334,940.30 in restitution to SCIF, and $87,156.69 in restitution to EDD, in monthly installments of $300 and $100, respectively.  (*Id.*, ¶¶ 45, 46.)

Notwithstanding the plea agreement, Tamara contends that Marugg essentially feigned cooperating with the Contractors State License Board (the "Board") to assist Jon in maintaining his contractor license.  Instead, Marugg used his position, and exploited the McAnally's dependence on him, to pursue a sexual relationship with Tamara.  As a result, from 2004 through 2009, Jon's license was continually placed on hold, causing significant financial problems for the McAnallys.

In late 2009, after Tamara had repeatedly refused Marugg's pleas to start a sexual relationship, Marugg stopped responding to Tamara's requests for assistance with the Board regarding Jon's contractor license.  (*FAC*, ¶¶ 79–84.)  Then in December 2009, Tamara received a call from Kim Alvarez, who identified herself as Marugg's girlfriend, and demanded to know why Tamara was calling Marugg.  (*Id.*, ¶ 85.)  During the conversation, Tamara learned that Marugg had also prosecuted Kim and her ex-husband.  (*Id.*, ¶ 85.)  In subsequent conversations, Kim told Tamara that Marugg admitted having numerous relationships with female defendants, both during and after he prosecuted them for insurance fraud.  (*Id.*, ¶ 86.)

Based on the information Tamara learned from Kim, Tamara began investigating Marugg.  (*FAC*, ¶ 90.)  Tamara contends that she learned that in 2001, Marugg's supervisors received a complaint that he was having an affair with Defendant Bradley, who was in charge of investigating insurance fraud allegations on behalf of SCIF.  (*Id.*, ¶ 91.)  She also learned that between 2001 and 2009, Marugg had "taken numerous

female defendants that he had prosecuted to functions sponsored by the D.A.'s Office, or where County officials were present, as well as on official business trips where supervisory person[nel], including DUGO and LATUCCA were present." (*Id.*, ¶ 92.) Tamara also discovered that "numerous other criminal defendants had filed complaints with the D.A.'s Office and other agencies alleging that MARUGG was having inappropriate relationships with female criminal defendants, and falsifying evidence during prosecution." (*Id.*, ¶ 95.)

In August 2010, Tamara contacted the D.A.'s Office regarding the information she learned about Marugg. (*FAC*, ¶ 103.) "On August 26, 2010, MARUGG received notice of an Administrative Investigation related to allegations lodged by [Tamara]." (*Id.*, ¶ 104.)   During the investigation, Marugg allegedly admitted many of the allegations, "including that he had inappropriate relationships with several former defendants." (*Id.*, ¶ 106.)   In exchange for the D.A.'s Office's agreement to forgo further investigation, Marugg agreed to retire. (*Id.*, ¶ 107.)   Therefore, no "further disciplinary action was taken by the D.A., nor was any report made to the California State Bar." (*Id.*)

On April 12, 2011, Tamara filed a Writ of Coram Nobis seeking to have her conviction overturned. (*FAC*, Ex. 4 at 2:1–2.)   Based on the information gathered from its investigation, the D.A. agreed not to oppose the writ, which was granted. (*Id.*) Then on May 16, 2011, the San Diego Superior Court entered an Order for Factual Finding of Innocence and Destruction of Records. (*Id.*, Ex. 3.)   This lawsuit followed.

## II.   STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted.   Fed. R. Civ. P. 12(b)(6).   A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.   See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).   A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under

a cognizable theory.  Balisteri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990).  In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007).

Complaints must contain "a short plain statement of the claim showing the that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to rise above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007).  The allegations in the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570).

Well-pled allegations in the complaint are assumed true, but a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences.  Papasan v. Allain, 478 U.S. 265, 286, (1986); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

## III.   DISCUSSION

Defendants argue that the federal and state claims are time barred because Tamara was convicted in 2004, but did not file the lawsuit until November 22, 2011. Therefore, the claims are barred by the applicable 2-year limitations period, as well as the 6-month time limit to file a government claim (applicable to Tamara's state claims).

Tamara argues that because the conviction was not overturned and the order of factual innocence was not entered until May 16, 2011, the limitations periods were tolled and the lawsuit is timely.  Defendants respond that because the FAC fails to explain Tamara's 7-year delay in moving to overturn her conviction, Tamara is not entitled to tolling.  The Court agrees with Tamara.

**A.    Tamara's federal claims are timely.**

As an initial matter, Defendants fail to cite any authority for the proposition that the statute of limitations began to run in 2004.  They simply assert that the 2-year statute of limitations expired in 2006 because "plaintiff was convicted in 2004." (*Mtn.* 5:17–18, 10:10–11.)  Given that Defendants are the moving party, they bear the burden of establishing when Tamara's claims accrued.  Defendants failure to cite any supporting legal authority or to explain why they believe the claims accrued in 2004 is a sufficient basis to reject their argument.

Moreover, Defendants' argument is inconsistent with Supreme Court authority.  In Heck v. Humphrey, 512 U.S. 477 (1994), the Court held,

> in order to recover damages for allegedly unconstitutional conviction . . ., or for harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under §1983.

Id. at 486–487.  Later, in Wallace v. Kato, 549 U.S. 384 (2007), the Supreme Court reiterated that "the Heck rule for deferred accrual is called into play only when there exists 'a conviction or sentence that has not been invalidated,' that is to say, an 'outstanding criminal judgment.'  It delays what would otherwise be the accrual date of a tort action until the setting aside *of an extant conviction* which success in that tort action would impugn." Id. at 393.

Here, Tamara alleges, among other things, that "she was convicted of a crime she did not commit" because Marugg fabricated evidence. (*FAC,* ¶ 114.)  Her section 1983 claim, therefore, necessarily impugns the 2004 conviction, and under Heck did not accrue until the San Diego Superior Court overturned the conviction on May 16, 2011.  Accordingly, Tamara's federal claims are timely.

**B.    Tamara's state-claims are timely.**

With respect to Tamara's state claims, Defendants again fails to cite any authority for the proposition that the limitations period began in 2004.  Regardless, even assuming that Tamara's claims accrued in 2004, the FAC's allegations do not support Defendants' statute of limitations defense.

Several principles of California's statute-of-limitations tolling law are relevant in analyzing Tamara's state claims.  First, under California law, the limitations period is tolled "until the plaintiff discovers, or has reason to discover the cause of action. [¶] A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'" Quarry v. Doe 1, 53 Cal.4th 945, 960 (2012). The discovery rule applies "when it is difficult for a plaintiff to observe or understand the nature of a defendant's wrongful act, or when an injury or its cause is hidden or beyond that which an ordinarily reasonable person could be expected to understand." Gerbosi v. Gaims, Weil, West & Epstein, LLP, 193 Cal.App.4th 435, 448 (2011). This principle is important because based on the FAC's allegations, it is reasonable to infer that Tamara did not have reason to suspect the factual basis for her claims until 2010.

According to the FAC, it was not until late December 2009, when Kim Alvarez contacted Tamara, that she learned that Marugg had previously pursued a sexual relationship with a woman he prosecuted.  (FAC, ¶ 85.)  In subsequent conversations with Kim, Tamara learned that Marugg had pursued sexual relationships with numerous women he prosecuted, and that Kim believed Marugg manufactured evidence in her case.  (Id., ¶¶ 86–87.)  Based on this information, Tamara contends that in early 2010, she began to investigate the circumstances of her conviction, and realized the facts and circumstances of her prosecution matched those surrounding Kim's prosecution.  (Id., ¶ 90.)  Based on these facts, it is reasonable to infer that Tamara did not suspect the factual basis for her claim until 2010.

The FAC's allegations also offer an explanation for Tamara's failure to suspect Marugg's wrongful conduct before 2010.  The allegations demonstrate that Marugg

11cv2741w

1  fostered a situation in which Tamara was dependent on his assistance and grew to trust
2  Marugg.

3        Under the plea agreement's terms, the McAnallys depended on Marugg's
4  cooperation with the Board in order to maintain Jon's contractor license. (*FAC*, ¶ 49.)
5  The McAnallys were also required to send Marugg copies of all restitution payments.
6  (*Id.*, ¶ 48.)   And despite Marugg's obligation to cooperate with the Board, the FAC
7  alleges Marugg essentially feigned cooperation, resulting in the Board continually
8  placing a hold on Jon's license, making the McAnallys more dependent on Marugg's
9  assistance.  (*Id.*, ¶¶ 50, 55, 72.)   Morever, as a result of the holds placed on Jon's
10  license, Tamara was in frequent contact with Marugg. (*FAC*, ¶¶ 50–65.)  Throughout
11  this period, Tamara alleges that Marugg acted as if he cared about her, eventually
12  volunteering to write a letter of recommendation and assist her in obtaining a real-
13  estate license. (*Id.*, 65–74.)  She further alleges that in 2005, Marugg offered to reduce
14  her felony conviction to a misdemeanor, and that he later told Tamara that he "hoped
15  that this action and the later offer to expunge the convictions of both TAMARA and
16  JON would convince TAMARA that he was sincere in his affection for her." (*Id.*, ¶
17  67.)   Together, these facts support Tamara's allegation that Marugg intentionally
18  fostered a dependant and trusting relationship that he used to try to start a sexual
19  relationship with her. (*Id.*, ¶ 78.)  Under these circumstances, Tamara did not have
20  reason to suspect before 2010 that Marugg fabricated evidence in her case.

21        The second California principle that is relevant to this case tolls the limitations
22  period "when a person has 'several formal legal remedies and reasonably and in good
23  faith pursues one.'"  <u>Donoghue v. Orange County</u>, 848 F.2d 926, 930 (9th Cir.
24  1987) (citing <u>Jones v. Tracy School Dist.</u>, 27 Cal.3d 99, 108 (1980)).   This principle is
25  significant because the FAC demonstrates that after discovering the factual basis for her
26  claims in 2010, Tamara reasonably and in good faith pursued her legal remedies, thus
27  continuing to toll the statute of limitations until her conviction was overturned.

28

1    Specifically, the FAC alleges that as a result of her investigation that began in
2 early 2010, Tamara learned, among other things, that "numerous other criminal
3 defendants had filed complaints with the D.A.'s Office and other agencies alleging that
4 MARUGG was having inappropriate relationships with female criminal defendants, and
5 falsifying evidence during prosecution." (*FAC*, ¶ 95.)   As a result, in August 2010,
6 Tamara contacted the D.A.'s Office, which began the Administrative Investigation of
7 Marugg. (*Id.*, ¶¶ 103–104.)  Then on April 12, 2011, Tamara filed the writ to overturn
8 her conviction.  As a result of the investigation initiated by Tamara, the D.A. agreed
9 not to oppose the writ, which was granted on May 16, 2011.

10    In short, based on the FAC's allegations, it is reasonable to infer that Tamara did
11 not discover the factual basis for her claims until 2010.  It is also reasonable to infer that
12 once she discovered the factual basis, Tamara reasonably and in good faith took steps
13 to overturn her conviction.  Accordingly, the Court finds that the statute of limitations
14 on Tamara's state claims also did not commence until May 16, 2011.

15

16    **C.    <u>At this stage, Defendants are not entitled to absolute immunity</u>**.

17    The Supervisor Defendants argue that Tamara's federal claims should be
18 dismissed on the following additional grounds: (1) the Supervisor Defendants have
19 absolute immunity for conduct related to their role as advocates; (2) Tamara has failed
20 to allege that the Supervisor Defendants' acts or omissions led to the violation of her
21 constitutional rights; and (3) Tamara failed to allege Marugg's conduct was pursuant
22 to a County policy or practice.  (*MTD*, 6:11–7:20.)  For the reasons discussed below,
23 the Court is not persuaded by these arguments.[2]

24

25

26    [2] Neither party has raised the issue about whether Marugg's conduct rises to the level
27 of a constitutional violation.  Accordingly, in order to decide whether absolute immunity
applies, the Court assumes without deciding that Tamara has alleged a deprivation of a
28 constitutional right under § 1983.  <u>See</u> <u>Genzler v. Longanbach</u>, 410 F.3d 630, 643–644 (9th
Cir. 2005).

1    Prosecutors are entitled to absolute immunity "when performing the traditional
2    functions of an advocate." <u>Genzler</u>, 410 F.3d at 636 (citing <u>Kalina v. Fletcher</u>, 522 U.S.
3    118, 131 (1997)).   However, a prosecutor's conduct is not covered by absolute
4    immunity merely because it was performed by a prosecutor.   <u>Id.</u> (citing <u>Buckley v.</u>
5    <u>Fitzsimmons</u>, 509 U.S. 259, 273 (1993)).   Instead, prosecutorial immunity "depends on
6    the nature of the function performed, not the identity of the actor who performed it."
7    <u>Broam v. Bogan</u>, 320 F.3d 1023, 1029 (9th Cir. 2003) (citing <u>Kalina</u>, 522 U.S. at 127).
8    Where the prosecutor is performing administrative functions or "investigative functions
9    normally performed by a detective or police officer," the prosecutor is entitled to
10   qualified immunity.   <u>Genzler</u>, 410 F.3d at 636.

11   "[T]he official seeking absolute immunity bears the burden of showing that such
12   immunity is justified for the function in question."   <u>Genzler</u>, 410 F.3d at 636 (citing
13   <u>Burns v. Reed</u>, 500 U.S. 478, 494–96 (1991)).   The presumption is that qualified
14   immunity, rather than absolute immunity, "is sufficient to protect government officials
15   in the exercise of their duties" and "the Supreme Court has 'been quite sparing in its
16   recognition of absolute immunity, and has refused to extend it any further than its
17   justification would warrant."   <u>Id.</u> at 636–637 (internal brackets omitted).   Thus, in
18   order to obtain absolute immunity, the prosecutor bears the burden of establishing that
19   the act in question is "intimately associated with the judicial phase of the criminal
20   process."   <u>Genzler</u>, 410 F.3d 636 (citations omitted).

21   Here, the Supervisor Defendants are being sued for their failure to properly train
22   or supervise Marugg.   Accordingly, in order to determine if the Supervisor Defendants
23   are immune from liability, the Court must evaluate whether Marugg's conduct was
24   intimately related to the judicial phase of the criminal prosecution.   If it was, then the
25   Supervisor Defendants' supervision and training of Marugg's conduct is also covered by
26   absolute immunity.   <u>See</u> <u>Ceballos v. Garcetti</u>, 361 F.3d 1168, 1184 (9th Cir. 2004)
27   (evaluating the supervised conduct to determine if the supervisor is entitled to absolute
28   immunity); <u>Genzler</u>, 410 F.3d at 644. If Marugg was not engaged in such conduct, then

the Supervisor Defendants are not entitled to absolute immunity.  Id.  For several reasons, the Court finds that the Supervisor Defendants are not entitled to absolute immunity based on the FAC's allegations.

First, the Supervisor Defendants have failed to adequately identify the functions that serve as a basis for Tamara's claims.  According to the motion, Marugg's conduct involved filing criminal charges in order to pursue sexual relationships, and a conflict of interest involving the D.A. Office's receipt of payments for prosecuting insurance fraud cases.  (MTD, 6:14–21.)  This description is far too general, and ignores other conduct identified in the FAC that does not appear to fall within the traditional role of an advocate.

Tamara claims that Marugg fabricated evidence in order to obtain her conviction.  Whether absolute immunity applies to this claim depends on when the fabrication occurred.  If it occurred early in the investigation, before there was probable cause for an arrest, the fabrication is not covered by absolute immunity.  See Broam 320 F.3d at1033 (explaining that if the witness interview occurred "before probable cause was established, only qualified immunity would apply . . . .").

In Buckley, the Supreme Court explained that a prosecutor is not absolutely immune for conduct that, if performed by a police officer, would only be subject to qualified immunity:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.  When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

Id., 509 U.S. at 273 (citation omitted).

Here, the Supervisor Defendants have failed to analyze the FAC in order to determine when the fabrication occurred and thus have failed to satisfy their burden of

establishing that absolute immunity applies.  Moreover, the FAC's allegations suggest the fabrication occurred before there was probable cause.  According to the FAC, before being indicted, Tamara provided "conclusive evidence" to Marugg that she had not committed a crime.  (*FAC*, ¶ 32.)  This allegation is bolstered by the San Diego Superior Court order finding Tamara factually innocent.  (*Id.*, Ex. 3.)  Additionally, the FAC's allegations suggest that Marugg's decision to prosecute Tamara may have resulted from his desire to pursue a sexual relationship with her, as he had done with numerous women.[3]  Based on these allegations, it is reasonable to infer that there was never probable cause to arrest and prosecute Tamara, and thus the fabrication claim is not covered by absolute immunity.

Tamara also charges Marugg with improper conduct lasting long after the prosecution ended.  Specifically, Tamara charges Marugg with improper conduct during the duration of the plea agreement.  As discussed above, the FAC alleges that the plea agreement obligated Marugg to cooperate with the Board so that Jon could maintain his contractor license.  Despite this obligation, Marugg feigned cooperation, resulting in the repeated suspension of Jon's license and significant economic damages to the McAnallys.  Further, the FAC alleges that Marugg acted intentionally in order to gain Tamara's confidence and pursue a sexual relationship with her.

The Supervisor Defendants' papers have failed to explain how Marugg's post-conviction conduct is "intimately related" to the judicial phase of Tamara's prosecution.  Nor have the Supervisor Defendants cited any authority holding that a prosecutor's

---

[3] This inference is supported by the allegations that Lutzi, who was referred to as Marugg's "pimp," would "tip" Marugg when Lutzi "believed that there were women that MARUGG would find sexually attractive."  (*FAC*, ¶ 31.)  Consistent with this practice, the FAC alleges that after meeting Tamara, Lutzi arranged for the meeting between Marugg and Tamara, during which time Marugg never discussed the case and instead talked exclusively about personal matters, including Tamara's marriage and family.  (*Id.* ¶¶ 27– 29.)  Tamara further alleges that Marugg later admitted, "I knew I had to have you *the first time I saw you.*"  (*Id.*, ¶ 30, emphasis added.)

conduct long after the conviction was obtained constitutes advocacy intimately related to the judicial system.  And case law establishes that conduct occurring after a conviction, and which is unrelated to an appeal, may not be covered by absolute immunity.  See Guzman-Rivera v. Rivera-Cruz, 55 F.3d 26, 28 (1st Cir.) (holding that prosecutor's post-conviction investigative conduct was not entitled to absolute immunity); Houston v. Partee, 978 F.2d 362, 367 (7th Cir. 1992) (same). Accordingly, the Court finds that Marugg's post-conviction conduct was not intimately related to the judicial process, and thus the Supervisor Defendants' alleged failure to adequately supervise Marugg's conduct is not covered by absolute immunity.

The Supervisor Defendants next argue that Tamara failed to allege Marugg's conduct was pursuant to a policy or practice, and that their acts or omissions led to the violation of Tamara's constitutional rights.  Citing Iqbal, the Supervisor Defendants argue that their alleged knowledge of Marugg's actions is not enough to establish supervisory liability. (MTD, 8:17–24.)

But Iqbal dealt with a claim of purposeful discrimination against the United States Attorney General and the Director of the F.B.I., in their capacity as supervisors. In light of the purposeful discrimination claim, the Court required the plaintiff to "plead and prove that the defendant acted with discriminatory purpose" which requires "more than intent as volition or intent as awareness of consequences." Iqbal, 556 U.S. at 678. The Court further explained that the factors necessary to establish a claim against the supervisors will depend on the constitutional provision at issue.  Id.

Based on this reading of Iqbal, the Ninth Circuit has clarified that "[w]e have long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, *or inaction*, is directly attributed to them." Starr v. Baca, 652 F.3d 1202, 1205–1206 (9th Cir. 2011) (emphasis added).  And a "custom or practice can be 'inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." Hunter,

1   D.V.M., v. County of Sacramento, 652 F.3d 1225, 1234 (9th Cir. 2011) (internal

2   quotations and citations omitted).

3         Here, Tamara alleges that the Supervisor Defendants were well aware of

4   Marugg's improper conduct, but failed to discipline or reprimand him.  Specifically,

5   Tamara alleges that the Supervisor Defendants were present at D.A. sponsored

6   functions and on official business trips, which Marugg used to pursue romantic

7   relationships with women he previously prosecuted.  (*FAC*, ¶ 92.)  Tamara further

8   alleges that the Supervisor Defendants were aware of pornographic emails that Marugg

9   was sending to previously prosecuted female defendants, and that over a half dozen

10  women had filed complaints with the D.A.'s Office alleging Marugg was "having

11  inappropriate relationships with female criminal defendants. . . ." (*Id.*, ¶ 96.)  Resolving

12  all reasonable inferences in favor of Tamara, the Court finds she has sufficiently pled

13  that the Supervisor Defendants were aware of Marugg's alleged misconduct, yet

14  ignored their supervisory responsibility and did nothing about the conduct.  As such,

15  the Court finds Tamara has alleged a pattern and practice of conduct by the Supervisor

16  Defendants that resulted in Marugg's alleged violation of Tamara's constitutional rights.

17

18        **D.**     **State Immunities**

19        The Supervisor Defendants also raise a number of state statutory immunities that

20  they contend bar Tamara's state claims.  At this stage in the litigation, the Court is not

21  persuaded that the immunities warrant dismissal of Tamara's claims.

22        The Supervisor Defendants first argue the claims are barred by Government

23  Code § 820.2, which bars claims for injuries arising from instituting or prosecuting any

24  judicial or administrative proceedings, even if the employee acts maliciously and

25  without probable cause.  Gov't Code § 821.6; Kaplan v. LaBarbera, 58 Cal.App.4th

26  175, 180 (1997).  As explained above, however, Tamara's claims relate to a number of

27  different functions or conduct spanning from approximately 2004 through 2009.  And

28  the Supervisor Defendant have failed to establish that Marugg's conduct was related

1  to "instituting or prosecuting any judicial proceeding." Moreover, it is clear that at least
2  some of Tamara's claims relate to Marugg's post-conviction conduct, which does not
3  appear to fall within the scope of section 820.2.  Accordingly, the Court finds dismissal
4  of Tamara's state claims based on section 820.2 is not warranted at this time.

5      Defendants next argue that the claims are barred by Civil Code § 47, which
6  protects communications made in connection with the prosecution.  Cal. Civ. Code §
7  47; GeneThera, Inc. v. Troy & Gould Professional Corp., 171 Cal.App.4th 901, 909
8  (2009).  However, as Tamara points out, the Supervisor Defendants fail to identify how
9  this privilege applies to this case.  Accordingly, dismissal on this ground is also denied.
10
11 **III.   CONCLUSION**
12      For all the reasons stated above, the Court **DENIES** Defendants' motion to
13 dismiss [Doc. 25].
14      **IT IS SO ORDERED.**
15
16 DATED:  July 3, 2013
17
18                                      _____
                                        Hon. Thomas J. Whelan
19                                      United States District Judge
20
21
22
23
24
25
26
27
28